## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **RAMONNE and TERRICA THOMAS, individually and TERRICA THOMAS, as the administrator of the ESTATE of BOSTON THOMAS, Deceased,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**COBB COUNTY, a political subdivision of the State of Georgia, through its instrumentality the COBB COUNTY POLICE DEPARTMENT; and COBB COUNTY POLICE OFFICER CONNOR GEHAN, in his individual capacity**<br><br>**Defendants.** | **JURY TRIAL DEMANDED**<br><br>CIVIL ACTION FILE NO. |

## COMPLAINT FOR DAMAGES

**COME NOW** RAMONNE and TERRICA THOMAS, individually, and TERRICA THOMAS as the administrator of the ESTATE of BOSTON THOMAS, Deceased (collectively referred to herein as "Plaintiffs"), and make and file this Complaint for damages against COBB COUNTY, a political subdivision of the State of Georgia, through its instrumentality the COBB COUNTY POLICE DEPARTMENT, and COBB COUNTY POLICE OFFICER CONNOR GEHAN, in his individual capacity, and show this Honorable Court as follows:

///

## PRELIMINARY STATEMENT

1

1. This is a civil action brought under 42 U.S.C. § 1983, the Fourth Amendment, and the Fourteenth Amendment, arising from the wrongful death of Plaintiffs' son, Boston Thomas, who was killed on May 19, 2024, when Officer Connor Gehan, acting within the course and scope of his employment with Defendant Cobb County through its Police Department, unlawfully initiated and continued a late-night vehicular pursuit of the vehicle operated by Boston Thomas and executed a PIT maneuver despite the absence of any serious violent felony or immediate threat to public safety, causing Boston's vehicle to crash and resulting in his death at age 21.

## THE PARTIES

2. BOSTON THOMAS is the son of Plaintiffs TERRICA THOMAS (Mother) and RAMONNE THOMAS (Father).

3. Plaintiff TERRICA THOMAS is a resident and citizen of the State of Georgia and is the natural mother of BOSTON THOMAS, deceased.

3. Plaintiff RAMONNE THOMAS is a resident and citizen of the State of Georgia and is the natural father of BOSTON THOMAS, deceased.

4. Plaintiff TERRICA THOMAS is the duly appointed administrator of the Estate of BOSTON THOMAS, deceased, having been appointed by the Probate Court of Cobb County (see attached Exhibit "A").

5. Defendant COBB COUNTY is a political subdivision of the State of Georgia,

COMPLAINT FOR DAMAGES

6. Officer CONNOR GEHAN, whose PIT maneuver caused Boston Thomas' death was at all relevant times herein, a sworn police officer of Cobb County's Police Department. In his capacity as a Cobb County Police Officer, Officer Gehan was responsible for preserving the peace and protecting the lives, persons, property, health, and morals of the people, under the color and pretense of federal and state laws as well as the ordinances, regulations, customs, and usages of the State of Georgia, Cobb County, and the Cobb County Police Department.

7. Defendant Gehan is sued in his individual capacity. At all times relevant herein, Defendant Gehan acted under the color of law and pretense of state law and the constitutions, statutes, ordinances, regulations, customs and usages of the United States of America, the State of Georgia, Cobb County, the Cobb County Sheriff's Office, and under the authority of their office as law enforcement officers. On information and belief, the supervisors in Defendant Gehan's chain of command during the relevant time period were Cobb County Police Officer, Shane Rockey; Cobb County Police Department, Lieutenant, Jeffrey Tatroe; Cobb County Police Department, Precinct Three, Major, D. Ballard; Cobb County Police Department, Deputy Chief, Ben Cohen; Cobb County Police Department, Deputy Chief, Stephen Kucynda; and, Cobb County Police Department, Chief, James Ferrell. Plaintiffs reserve the right to substitute and/or join additional Defendants as new information arises concerning Defendant Gehan's supervision.

## NATURE OF THE CASE

COMPLAINT FOR DAMAGES

8. At approximately 3:00 a.m. on May 19, 2024, Officer Conor Gehan accelerated his patrol vehicle up to a speed of approximately ninety-six (96) miles per hour, then rammed it into the rear of a vehicle operated by Boston Thomas.

9. At nearly one hundred miles per hour Officer Gehan knew that ramming Thomas' vehicle at that speed would cause Thomas to suffer serious injury or death.

10. At the time he rammed Thomas' vehicle, according to Officer Gehan admitted there was "no traffic" in the area where their vehicles were operating.

11. As such, Gehan did not ram Thomas' vehicle to prevent a threat to the safety of other motorists or pedestrians.

12. At the time Officer Gehan rammed Thomas' vehicle Officer Gehan had not observed Thomas commit any felony offense.

13. At the time Officer Gehan rammed Thomas' vehicle Officer Gehan had not observed Thomas possessing a deadly weapon.

14. At the time Officer Gehan rammed Thomas' vehicle, Thomas did not pose an immediate threat of physical violence to Gehan or others.

15. At the time Officer Gehan rammed Thomas' vehicle, Officer Gehan had no probable cause to believe that Thomas had committed a crime involving the infliction or threatened infliction of serious physical harm.

COMPLAINT FOR DAMAGES

16. This action for damages arises from the preventable and untimely death of Georgian – BOSTON THOMAS – a 21-year-old African American male – who died as a result of the events "set in motion" after Cobb County Police Officer Conner Gehan decided to follow "an older model Lexus sedan," merely because he believed it's driver (Thomas) was "acting weird."

17. At no point did Officer Gehan observe Thomas engaging in or committing any unlawful act, BEFORE, he decided to follow him. Nevertheless, Officer Gehan followed Thomas to and through a McDonalds' parking lot, purportedly becoming suspicious when he allegedly witnessed Thomas break line in the McDonald's drive-through line. Gehan added that he saw a headlight out on the vehicle Thomas was driving, though Thomas' vehicle actually had one operative headlight and one high-beam headlight actuated.

18. For these reasons, Officer Gehan allegedly became suspicious and concluded that Thomas was "up to something." As a result, Gehan called his partner, Officer S.T. Rockey for backup.

19. Following Thomas, Officer Gehan observed him roll past a stop sign. Trailing Thomas' vehicle, Officer Gehan allegedly observed it with a center brake light out, clearly indicating that Thomas put on his brakes at the stop sign.

20. Next, Officer Gehan allegedly observed Thomas slow roll through a red light.

21. Submitting to Officer Gehan's authority, Thomas then brought his vehicle to a complete stop.

5

COMPLAINT FOR DAMAGES

22. After stopping his vehicle for a brief period of time, Thomas accelerated his vehicle and fled.

23. In response, Officer Gehan decided to initiate a vehicular pursuit, resulting in a roughly 96 mile per hour high-speed car chase, that lasted a mere one (1) minute and spanned a distance of only 1.3 miles.

24. Almost immediately after the pursuit began, Officer Gehan attempted his first PIT maneuver on Thomas' vehicle but aborted the effort for reasons that are unclear as this would have been a comparatively low speed PIT maneuver.

25. At the time Officer Gehan initiated the PIT maneuver, he had not observed Thomas commit or committing any felony offense, as the traffic offenses he allegedly observed were all misdemeanor traffic offenses, including two lighting equipment offenses only.

26. Mere seconds into the pursuit after traveling about 0.4 miles, BEFORE speeds reached a verifiable 20 miles an hour above the posted speed limit, without notifying dispatch or other officers of his intent, Officer Gehan decided to use a Precision Immobilization Technique (hereafter "PIT maneuver") to stop the chase.

27. After Thomas drove through a cemetery along a paved road and then back onto the roadway and across the Fulton County line, Defendant Gehan successfully performed a PIT maneuver on Thomas' vehicle, ultimately

COMPLAINT FOR DAMAGES

killing Thomas and totaling his vehicle. Aside from Thomas no one else was injured.

28. After Thomas' death, Officer Gehan's fellow officers created a post hoc narrative to justify Officer Gehan's actions. Another officer stated that one of Thomas' headlights was inoperable, and that he engaged in the pursuit of Thomas "so we could obtain more information about the vehicle and confirm it had not been involved in a felony to now."

29. That same unknown officer also stated that at the time of the first PIT attempt, that speeds were 20 miles per hour above the posted speed limit, and that Thomas was rib shaking Officer Gehan, endangering his life and the lives of other drivers, despite Officer Gehan acknowledging there was "no traffic" on the roadway.

30. The headlights to Thomas' vehicle were operable (one headlight in regular mode, one headlight in high-beam mode).

31. Officer Gehan's fellow officers felt compelled to protect him and come to his defense by way of a post hoc justification for his actions, because Officer Gehan acted contrary to written Cobb County Police Department policies, acted with reckless disregard for proper law enforcement procedures, and violated Thomas' constitutional rights, despite the availability of a multitude of other safer options, including but not limited to continuing his pursuit of Thomas at the vehicle's registered address which Gehan obtained from GCIC at the onset of the pursuit.

COMPLAINT FOR DAMAGES

## FACTUAL ALLEGATIONS

### The Tier Two *Terry* Stop

32. On Sunday May 19, 2024, at approximately 3:00 a.m., Defendant Gehan decided he was going to seize and detain Thomas' vehicle.

33. When this decision was made, Defendant Gehan was driving a marked 2019 Ford Explorer (SUV), owned by Defendant Cobb County.

34. Before informing dispatch of his intentions, Defendant Gehan told another Cobb County Police Officer that he "observed an older model Lexus sedan at McDonalds," that he intended to seize and detain.

35. When Defendant Gehan relayed his intentions to dispatch, he did not plainly and clearly articulate the basis and or what crime he reasonably suspected that Thomas was committing, had committed, or was about to commit.

36. At the time of his seizure and detention, Thomas was driving a 2000 Lexus ES300, registered to his father, Plaintiff Ramonne Thomas. The Lexus had tinted windows, which were never deemed or articulated by Cobb County Police to be unlawful or a reason to justify any detention of Thomas.

37. Additionally, per the Georgia Motor Vehicle Crash Report, the condition of the Lexus did not, at all, contribute to the fatal incident.

COMPLAINT FOR DAMAGES

38. After the fatality, Defendant Gehan told the Georgia State Patrol that he decided to seize Thomas, because he was "acting weird."

39. Thomas' post-mortem toxicology reports were negative for marijuana, alcohol, and amphetamines, cocaine, and cocaine metabolites.

40. In a supplemental report, Cobb County Police Officer Shane Rockey wrote that "[Defendant] Gehan advised me that he had observed an older model Lexus sedan at McDonald's near the intersection."

41. Rockey added that "[w]hen he pulled up to the McDonald's, [Defendant] Gehan advised dispatch that he was conducting a traffic stop on the vehicle." Rockey's report does not reflect why Thomas came to Defendant Gehan's attention.

42. Rockey also wrote, that he observed the older model Lexus "going southbound onto 280 from Oak Dr. and noticed that the vehicle's headlight" (vague as to which one) "was inoperable."

43. Both headlights of the Lexus at issue were in operation (with one in low beam mode, the other in high beam mode) just prior to Thomas' detention.

44. In his supplemental report, Rockey added that he himself engaged in a vehicle pursuit of Thomas "so we could obtain more information about the vehicle and confirm it had not been involved in a felony."

COMPLAINT FOR DAMAGES

45. Just before Defendant Gehan could initiate the *Terry* stop, Thomas depressed his vehicle's brakes and slowly rolled through a stop sign at the intersection of James Jackson Parkway/State Route 280 near I-285, while turning right onto Route 280.

46. Defendant Gehan followed Thomas by turning right and then made a show of authority by activating his emergency blue lights.

47. In response, Thomas slowed and began to merge left into a "safety gore," just before the bridge of the I-285 expressway.

48. Before coming to a complete stop, Thomas drove back onto Route 280, and through a red light.

49. Defendant Gehan followed Thomas and again made a showing of authority by letting off a brief siren. Thomas then came to a complete stop in the number one (1) lane. As Defendant Gehan was calling in Thomas' plate number and preparing to exit his vehicle, Thomas drove off, act that provided Cobb County Police with probable cause to arrest him for the crime of fleeing the traffic stop. (*See State v. Stafford*, 288 **Ga**. App. 309, 653 S.E.2d 750, 755 (**Ga**. Ct. App. 2007); *see also United States v. Green*, No. 4:21-cr-159, 2022 U.S. Dist. LEXIS 135204, at *4-5 (S.D. Ga. July 28, 2022).)

50. The action of running a stop sign and or red light is a misdemeanor traffic offense, which must be treated as a non-criminal offense where a civil fine is imposed. **(O.C.G.A. § 40-6-20(a) and (f)(4)).** The initial act of fleeing an officer ("eluding") is an **aggravated misdemeanor** carrying a maximum

statutory penalty of a $5,000.00 fine, and imprisonment of no more than 12 months, for a first offense. **(O.C.G.A. § 40-6-395 (a), and (b)(1)(A)).** For these verifiable misdemeanor infractions, Defendant Gehan made a conscious decision to activate his siren and initiate an unauthorized vehicle pursuit.

### **The Pursuit**

51. The Cobb County Police Department Policy on Vehicle Pursuits in force and effect on May 19, 2024 states that:

> An officer shall **only** pursue a motor vehicle when there is **reasonable suspicion based upon the totality of the circumstances that the driver** and/or occupant(s) **have committed, are attempting to commit, or are committing**:
>
> - *Murder*
> - *Voluntary Manslaughter*
> - *Involuntary Manslaughter*
> - *Aggravated Assault*
> - *Aggravated Battery*
> - *Kidnapping*
> - *Rape*
> - *Armed Robbery*
> - *Hijacking a Motor Vehicle*
> - *Any other crime which may include the immediate risk of serious bodily harm to any person (Note: The risk posed by the pursuit may not be the sole justification for the pursuit under this particular justification.)*
>
> **Should an officer attempt to make, or make, a traffic stop based upon a traffic offense or other legal reason, at a time when the information may be insufficient to establish 'reasonable suspicion' of one or more of the above listed pursuable offenses, and the violator flees,** the officer may pursue for a reasonable amount of time to

attempt to obtain further information about the <u>suspect/vehicle</u>. ***If no further information can be obtained within a reasonable amount of time based upon the circumstances, or the occupant(s)/vehicle cannot be verified as being involved in one of the above listed offenses, <span style="color:red">the pursuit should be discontinued</span>***.

***(See Cobb County Police Department Policy 5.15, Vehicle Pursuits, subsection III, section B (emphasis added)).***

52. The mandatory language ("shall only") of the policy on vehicle pursuits leaves no room for discretion. Defendant Gehan was prohibited from engaging in a vehicle pursuit that did not involve the aforementioned offenses and or continue a pursuit beyond the time reasonably required to obtain further information about the vehicle, such as its license plate number and or criminal history of the registered owner.

53. When Defendant Gehan made the decision to begin the vehicle pursuit of Thomas, he did not have any articulable or other reason to suspect that Thomas had committed, was attempting to commit, or was committing any of the aforementioned articulated offenses.

54. Defendant Gehan did not utilize his time or make any attempts to obtain further information about the vehicle/suspect during the pursuit.

55. Additionally, Defendant Gehan did not discontinue the pursuit in light of the missing information and the presented circumstances, three misdemeanor offenses. Instead, he escalated the situation even further by using deadly force, a PIT maneuver, to end the pursuit.

COMPLAINT FOR DAMAGES

56. Defendant Gehan is not shielded by the discretionary function exception as it relates to the high-speed chase, because he failed to conduct the non-discretionary antecedent assessment required by the relevant Cobb County Policy.

57. When Thomas drove away from the traffic stop, accelerating the speed of his vehicle from zero to an unknown miles per hour speed, he drove through two green lights before braking and merging left into the multidirectional turn lane.

58. After appearing to miss his intended left turn, Thomas entered the northbound lane of traffic briefly, then attempted to merge back toward the right but was blocked by Officer Gehan who was setting up his initial PIT maneuver (Officer Gehan did not inform other officers of his intent to do so).

59. In response, to avoid harm, Thomas drove back into the northbound lane of traffic and immediately onto a driveway and into Hooper-McWilliams Cemetery. Officer Rockey characterizes this activity, within his supplemental report, as being felonious, and states the following:

"the speeds were in excess of 20 miles per hour over the posted speed limit (45 MPH) […] the driver then slammed on his brakes multiple times and kept turning his vehicle into Officer Gehan's path […] to make Officer Gehan crash ["rib shacking"] […] actions [the Officer feared] posed a danger to the life and safety of [other drivers]."

60. Officer Rockey's post hoc narrative does not at all match the true facts as Thomas did not slam on his brakes multiple times, and he did not turn his vehicle into the path of Officer Gehan's vehicle.

COMPLAINT FOR DAMAGES

61. Further, whether the Lexus Thomas was driving was even physically capable of accelerating from 0 to 65 miles per hour (20 miles above the posted speed limit) within a mere 0.4 miles, is unknown.

62. According to a Bulletin of the Federal Law Enforcement Training Centers' Applied Research Branch:

> *The Precision Immobilization Technique (PIT) maneuver has been used by law enforcement since the 1980s to disable a fleeing vehicle. […] The PIT was developed by Bill Scott Raceway (BSR), Inc. out of Summit Point Raceway located in West Virginia, a training group that specializes in evasive driving and other highly specialized driving maneuvers [citation omitted]. PIT was introduced as a law enforcement technique by the Fairfax County Police Department (VA) during the 1980s. The PIT maneuver consists of applying lateral pressure to the rear quarter panel of the fleeing [t]arget vehicle resulting in a predictable spin-out action of [t]arget vehicle. The predictable spin-out action is one of the reasons the maneuver is considered a precision technique.*

63. Other sources, such as Police1 (a comprehensive online training resource for law enforcement), have indicated that the use of the PIT maneuver has come under recent scrutiny since research showed that the outcome of the maneuver is not or less predictable when used on vehicles equipped with stabilization software (*see* Homeland Security Federal Law Enforcement Training Centers, Training Research, Electronic Stability Control and the Precision Immobilization Technique, pg. 9) and since use of the maneuver has resulted in vehicle overturns, crashes, and severe injuries (including but not limited to death). (*See What police officers need to know about the PIT maneuver*

COMPLAINT FOR DAMAGES

*(police1.com), ([https://www.police1.com/suspect-pursuit/articles/how-police-use-the-pit-maneuver-to-end-vehicle-pursuits-fZP3HtT386Mpu5oF/](https://www.police1.com/suspect-pursuit/articles/how-police-use-the-pit-maneuver-to-end-vehicle-pursuits-fZP3HtT386Mpu5oF/))*.

64. Based on the aforementioned, it is common knowledge within the police community that the PIT maneuver can result in catastrophic collisions (especially when high speeds are involved), and heavy damage or complete loss of target and/or patrol vehicles can occur.

65. As a result, PIT maneuvers are generally heavily regulated by departments and require specialized training that must be updated periodically. Some common/general limiting factors include:

- Reason for the pursuit (simple traffic violation, intoxicated driver, stolen car, felony crime, etc.);
- Target vehicle speed at the time the PIT is attempted;
- Roadway environment: interstate highway, local street, presence of other vehicles or pedestrians, physical obstructions, adverse weather conditions, etc.;
- Known occupants of the target vehicle: driver only, adult or children passengers; and
- Whether the patrol vehicle driver has been trained in the technique, and how recently.

66. The Cobb County Police Department has the following procedure for the use of pursuit intervention tactics, such as a PIT maneuver:

If it is determined that the fleeing vehicle must be stopped immediately to safeguard life and preserve public safety, the following forcible stopping techniques may be utilized **at the discretion** of the involved officers, <u>unless otherwise noted</u>. Additionally, <u>pursuit intervention tactics should only be utilized</u>

15

COMPLAINT FOR DAMAGES

by officers trained in their use. The potential risks involved in utilizing any of the techniques should always be weighed against the nature of the violation and the risk of allowing the pursuit to continue.

### The Police Pursuit Policy

67. Cobb County Police Department Policy on Vehicle Pursuits states that:

An officer shall **only** pursue a motor vehicle when there is **reasonable suspicion based upon the totality of the circumstances that the driver** and/or occupant(s) **have committed, are attempting to commit, or are committing**:

- *Murder*
- *Voluntary Manslaughter*
- *Involuntary Manslaughter*
- *Aggravated Assault*
- *Aggravated Battery*
- *Kidnapping*
- *Rape*
- *Armed Robbery*
- *Hijacking a Motor Vehicle*
- *Any other crime which may include the immediate risk of serious bodily harm to any person (Note: The risk posed by the pursuit may not be the sole justification for the pursuit under this particular justification.)*

**Should an officer attempt to make, or make, a traffic stop based upon a traffic offense or other legal reason, at a time when the information may be insufficient to establish 'reasonable suspicion' of one or more of the above listed pursuable offenses, and the violator flees,** the officer may pursue for a reasonable amount of time to attempt to obtain further information about the suspect/vehicle. *If no further information can be obtained within a reasonable amount of time based upon the*

16

> *circumstances, or the occupant(s)/vehicle cannot be verified as being involved in one of the above listed offenses, <u>the pursuit should be discontinued</u>.*

*(See Cobb County Police Department Policy 5.15, Vehicle Pursuits, subsection III, section B (emphasis added)).*

68. The mandatory language ("shall only") of the policy on vehicle pursuits leaves no room for discretion, so Defendant Gehan was prohibited from engaging in a vehicle pursuit that did not involve the aforementioned offenses and or continue a pursuit beyond the time reasonably required to obtain further information about the vehicle, such as its license plate number and or criminal history.

69. When Defendant Gehan made the decision to begin the vehicle pursuit of Thomas, he did not have any preconceived reason to suspect that Thomas had committed, was attempting to commit, or was committing any of the aforementioned articulated offenses.

70. Defendant Gehan did not utilize his time or make any attempts to obtain further information about the vehicle/suspect during the pursuit.

71. Additionally, Defendant Gehan did not discontinue the pursuit in light of the missing information and the presented circumstances, three misdemeanor offenses. Instead, he escalated the situation even further by using a PIT maneuver to end the pursuit.

72. Defendant Gehan is not shielded by the discretionary function exception as it relates to the high-speed chase, because he failed to conduct the antecedent

17

COMPLAINT FOR DAMAGES

assessment required by the relevant Cobb County Policy. (*See Kush Muhammad v. United States*, No. 23-5195, 2023 U.S. App. LEXIS 33258, at *6 (6th Cir. Dec. 13, 2023).).

## **The Precision Immobilization Technique**

73. Thomas drove away from the *Terry* stop and accelerated his speed from zero to an unknown mileage per hour and traveled about 0.4 miles through two green lights before abruptly braking and merging left into the multidirectional turn lane.

74. After appearing to miss his intended left turn, Thomas entered the northbound lane of traffic briefly, then attempted to merge back toward the right but was blocked by Defendant Gehan who was setting up for a PIT maneuver (Defendant Gehan did not inform other officers of his intent to do so).

75. In response, to avoid harm, Thomas drove back into the northbound lane of traffic and immediately onto a driveway and into Hooper-McWilliams Cemetery. Rockey characterized this activity, within his supplemental report, as being felonious, and stated the following:

"the speeds were in excess of 20 miles per hour over the posted speed limit (45 MPH) […] the driver then slammed on his brakes multiple times and kept turning his vehicle into Officer Gehan's path […] to make Officer Gehan crash ["rib shacking"] […] actions [the Officer feared] posed a danger to the life and safety of [other drivers]."

76. Rockey's post hoc narrative does not at all match the true events, as Thomas did not slam on his brakes multiple times, and did not turn his vehicle into the path of Defendant Gehan's vehicle multiple times.

77. Further, whether the Lexus Thomas was driving was even physically capable of accelerating from 0 to 65 miles per hour (20 miles above the posted speed limit) within a mere 0.4 miles, is unknown.

78. According to a Bulletin of the Federal Law Enforcement Training Centers' Applied Research Branch:

> *The Precision Immobilization Technique (PIT) maneuver has been used by law enforcement since the 1980s to disable a fleeing vehicle. […] The PIT was developed by Bill Scott Raceway (BSR), Inc. out of Summit Point Raceway located in West Virginia, a training group that specializes in evasive driving and other highly specialized driving maneuvers [citation omitted]. PIT was introduced as a law enforcement technique by the Fairfax County Police Department (VA) during the 1980s. The PIT maneuver consists of applying lateral pressure to the rear quarter panel of the fleeing [t]arget vehicle resulting in a predictable spin-out action of [t]arget vehicle. The predictable spin-out action is one of the reasons the maneuver is considered a precision technique.*

79. Other sources, such as Police1 (a comprehensive online training resource for law enforcement), have indicated that the use of the PIT maneuver has come under recent scrutiny since research showed that the outcome of the maneuver is not or less predictable when used on vehicles equipped with stabilization software (*see* Homeland Security Federal Law Enforcement Training Centers, Training Research, Electronic Stability Control and the Precision Immobilization

COMPLAINT FOR DAMAGES

Technique, pg. 9) and since use of the maneuver has resulted in vehicle overturns, crashes, and severe injuries (including but not limited to death). (*See What police officers need to know about the PIT maneuver (police1.com), ([https://www.police1.com/suspect-pursuit/articles/how-police-use-the-pit-maneuver-to-end-vehicle-pursuits-fZP3HtT386Mpu5oF/](https://www.police1.com/suspect-pursuit/articles/how-police-use-the-pit-maneuver-to-end-vehicle-pursuits-fZP3HtT386Mpu5oF/)*).

80. Based on the aforementioned, it is common knowledge within the police community that the PIT maneuver can result in catastrophic collisions (especially when high speeds are involved), and heavy damage or complete loss of target and/or patrol vehicles can occur.

81. As a result, PIT maneuvers are generally heavily regulated by departments and require specialized training that must be updated periodically. Some common/general limiting factors include:
   - Reason for the pursuit (simple traffic violation, intoxicated driver, stolen car, felony crime, etc.);
   - Target vehicle speed at the time the PIT is attempted;
   - Roadway environment: interstate highway, local street, presence of other vehicles or pedestrians, physical obstructions, adverse weather conditions, etc.;
   - Known occupants of the target vehicle: driver only, adult or children passengers; and
   - Whether the patrol vehicle driver has been trained in the technique, and how recently.

82. The Cobb County Police Department has the following procedure for the use of pursuit intervention tactics, such as a PIT maneuver:

   If it is determined that the fleeing vehicle must be stopped immediately to safeguard life and preserve public safety, the following forcible stopping techniques may be utilized **at the**

COMPLAINT FOR DAMAGES

**discretion** of the involved officers, <u>unless otherwise noted</u>. Additionally, <u>pursuit intervention tactics should only be utilized by officers trained in their use</u>. The potential risks involved in utilizing any of the techniques <u>should always be weighed against the nature of the violation and the risk of allowing the pursuit to continue</u>.

## Precision Immobilization Technique (PIT Maneuver)

83. The PIT maneuver shall only be used by officers in accordance with Department training received on the PIT maneuver.

84. When possible, the officer should communicate his intentions to PIT to other pursing officers.

85. The following safety related factors should be considered before the PIT maneuver is utilized:

      **a.** Speed
      **b.** Visibility
      **c.** Vehicular traffic conditions
      **d.** The presence of pedestrians
      **e.** Type of fleeing vehicle
      **f.** Whether children are known to be in the vehicle
      **g.** Road conditions
      **h.** Driving manifestations of the suspect

86. The PIT maneuver should not be used to stop a pursuit with a motorcycle or all-terrain vehicle unless the use of deadly force is warranted.

87. Specialty vehicles, such as Department SUVs, pick-up trucks, etc., should not normally be used for the PIT maneuver.

COMPLAINT FOR DAMAGES

88. The PIT maneuver may be considered a use of force and the officer's individual actions must be objectively reasonable under the totality of the circumstances.

***(See Cobb County Police Department Policy 5.15, Vehicle Pursuits, subsection V (emphasis added)).***

89. Defendant Gehan was last trained in the PIT maneuver in August of 2022, about two years before the fatal incident.

90. When Defendant Gehan made the decision to use a PIT maneuver, he did not know the speed of Boston Thomas' vehicle, the number and identity of the individual(s) occupying the Lexus, or whether the vehicle was equipped with stabilization software (wherein death or catastrophic injury were highly likely and foreseeable) and or if deadly force was warranted. Further, Officer Gehan was driving a department SUV, a vehicle that should NOT normally be used for a PIT, and he did not notify other officers of his intent to use the maneuver.

91. After driving into the Cemetery and along the paved road therein, Thomas drove out of the Cemetery using another driveway. Traveling right, Thomas returned to the number one (1) lane going southbound on State Route 280. He then traveled over the Chattahoochee River into Fulton County.

92. As Thomas left Cobb County and crossed the County line into Fulton County, Defendant Gehan (again without announcing the same to other officers), lined up for a PIT maneuver, this time successfully running Thomas off the road.

93. Defendant Gehan intentionally rammed his right front bumper into the left rear quarter panel of Thomas' Lexus, just behind the rear wheel. As a result,

Thomas lost control of the Lexus as it traveled left across the northbound lanes toward an oncoming vehicle, sideways up and over a curve, vaulting backwards over a guardrail, and then flipping nearly eight (8) times - striking several trees and scattering his belongings. Thomas' body was ejected from the Lexus.

94. The Lexus came to a rest upright in the tree line at the edge of a ditch, less than a few miles north of Bolton Rd. Thomas' body was found lying on his back adjacent to the inside of the guardrail.

95. Defendant Gehan is not shielded by the discretionary function exception as it relates to the PIT maneuver, because he failed to conduct the antecedent assessment required by the relevant Cobb County Policy. (See Kush Muhammad v. United States, No. 23-5195, 2023 U.S. App. LEXIS 33258, at *6 (6th Cir. Dec. 13, 2023).) (whether the fleeing vehicle must be stopped immediately to safeguard life and preserve public safety).

96. The Georgia State Patrol characterized the PIT as "non-messy" and clean, and within a completely EMPTY roadway, and the post hoc narrative of Defendant Gehan's fellow officer suggesting that Gehan's life was in danger is not supported by the true facts.

97. Additionally, Defendant Gehan did not take any observable action to weigh the following factors against the severity of three misdemeanor offenses before deciding to use a PIT maneuver:
   a. **Speed** - Officer Gehan did not know how fast Boston Thomas was driving, but he knew from his own speedometer that it was at an extremely high

COMPLAINT FOR DAMAGES

rate of speed;

b. **Traffic Conditions** – Officer Gehan disregarded oncoming traffic in the northbound lane and a large residential property located in the vicinity of where he decided to conduct his second PIT attempt;

c. *Type of Fleeing Vehicle* – Thomas was driving a 2000 Lexus vehicle model known to be equipped with stabilization software *[a safety feature that prevents the vehicle from skidding or spinning by automatically applying the brakes to help steer the vehicle in the right direction, and that statistically lessons the predictability of a PIT maneuver]*;

d. **Whether children are known to be in the vehicle** - Officer Gehan did not have a clear view into Boston Thomas' vehicle because of the tinted windows, and he admittedly did not know if there were any other passengers in the vehicle, and he made no known effort to find out before his PIT attempts;

a. **Driving manifestations of the suspect** – Officers who observed Thomas' behavior allegedly believed Thomas was impaired and that the same was displayed in his driving.

98. Georgia State Patrol Specialized Collision Reconstruction Team (SCRT) used the following phrase to describe Defendant Gehan's motive to PIT so close to the County line: "*Hurry up and get him, before we have to deal with Fulton County.*"

99. The entire pursuit lasted a mere one (1) minute and spanned a distance of only 1.3 miles. According to police calculations, made after the collision and based ONLY on the dash camera footage, Thomas' estimated speed at the time of

24

COMPLAINT FOR DAMAGES

the successful PIT maneuver, was roughly 91 MPH.

100. After his successful PIT, Defendant Gehan witnessed Thomas' vehicle running off the road and then rolling over multiple times.

101. Defendant Gehan then called in "rollover, start 704," advising dispatch to send medical services.

102. Defendant Gehan turned his patrol car around and into the northbound lane of travel, stopped the vehicle facing the site where the Lexus came to rest, and then exited the car with his gun drawn.

103. Two other patrol cars had already arrived on scene. These Cobb County officers likewise exit their vehicles with their guns drawn.

104. As a result of the PIT maneuver, the Lexus was rendered a total loss, and was towed to Cobb County Precinct 3, located at 1901 Cumberland Pkwy, Atlanta, Georgia 30339.

### The Cobb County Police Acted with the Intent to Harm Thomas

105. Knowing the case was not "that simple" and in their opinion could be deemed excessive force, the Cobb County officers who responded to the scene actively sought out the Georgia State Patrol so they could blame Thomas' death on his "own stupidity;" and, so they could "wrap up" the investigation before SCRT was called and before anyone had even identified Thomas' body.

COMPLAINT FOR DAMAGES

106.     Accordingly, after speaking with the responding officers and before reviewing any actual evidence, the Georgia State Patrol concluded that the incident was "clear cut," making several unsubstantiated incorrect conclusions, such as:

1) Thomas was intoxicated; and,

2) was stopped *because of* various moving violations, specifically:

    a) failing to yield at a stop sign,

    b) driving over the board, and

    c) failing to maintain his lane,

all of which did give Defendant Gehan lawful reason to seize and temporarily detain Thomas, but that ACTUALLY occurred only AFTER Officer Gehan made the decision to make his *Terry* stop, and that did not at all substantiate either the decision to pursue Thomas or to end the same with deadly force.

107.     Cobb County Police did not identify Thomas until about an hour after his death, at around 4:57 a.m., with rapid ID.

108.     When SCRT arrived, Cobb County officers informed them that Thomas had a suspended license and was not wearing his seatbelt – none of which were known at the time of the pursuit or the PIT.

109.     It was determined post fatal incident that, based on the condition of the seatbelt and Thomas' ejection from the vehicle, that Thomas was not wearing a seatbelt at the time of the PIT.

110.     Cobb County officers also informed SCRT that Defendant Gehan was apparently "spooked" and worried about the fact that the collision and death occurred in Fulton County. To which all the others seemed to identify, one

individual even stated something to the effect of: "yeah, isn't it scary to PIT Fulton, and we all get fucking replaced."

111.     The Georgia State Patrol troopers likewise actively complained about their Corporal's demand that they "waste their time" trying to get blood in a "non-prosecutable death case," because Thomas was purportedly "wrong to begin with, now he's really wrong, and he's dead." The dialogue continued for several minutes, including with SCRT to include, in pertinent part, the following statements from a Geogia State Patrol trooper to SCRT:

**"trying to pick my words to not persuade you one way or another,"**

**"has SCRT started getting blood on a non-prosecutable dead guy,"**

**"if it is non-pros, I never push it,"**

**"we know he was running from something."**

## The Notification

112.     At around 7:44 a.m., Georgia State Patrol (hereafter "GSP") showed up at the home of Plaintiffs, the address for which the Lexus was registered. Upon arrival GSP confirmed that Thomas' father was Ramonne Thomas. While at the door, the officers asked to speak with the Plaintiffs because Thomas had been in a "car accident." The entire interaction was recorded by the family's Ring Home Security camera.

113.     When the Plaintiffs came outside, a GSP officer stated, "there is just no way to say this nicely or gently, he was killed." The officer then stated that

27

the accident started in Cobb County, but that Thomas crashed across "the river" in Fulton County.

114.    While offering more details, the officer said that Thomas ran from police when Cobb County tried to do a traffic stop, for a burned-out headlight – *this was never articulated by Defendant Gehan or any other officer present for the traffic stop as the ACTUAL reason for the Terry stop.*

115.    Additionally, Thomas' headlights were operable at the time of the collision.

116.    Further, the post collision vehicle inspection of the Lexus confirmed that Thomas was using his headlights at the time of the collision. This inspection likewise reveals that the police did not inspect the headlight lamps of the Lexus.

117.    The inspection photos show that the impact of the collision damaged the left headlight, taking all but a portion of the lens cover completely off, making physical post-collision verification of the officer's narrative regarding the headlight nearly impossible.

118.    According to GSP, Cobb County officers just wanted to tell Thomas to get the headlight fixed, but then Thomas fled, driving through a cemetery "[leaving] the road, [driving] across graves and everything to get away" – *Ramonne Thomas drove to and walked around the cemetery the same day, and strangely, saw no evidence of vehicles driving through the grassy area of the cemetery, and that is because this account is false and did NOT happen –*

28
COMPLAINT FOR DAMAGES

*Thomas did not drive over any graves – he stayed on the paved roadway within the Cemetery.*

119.    According to GSP, once Thomas crossed the Chattahoochee River approaching Fulton County, Cobb County did an intervention technique to stop the Lexus, and Thomas crashed. Paramedics took Thomas to Kennestone Hospital, where he was pronounced dead.

120.    When Plaintiffs ask for details about the "technique" that was used to stop their son from "running," the GSP officer begins to fidget, avoid eye contact, play with his hat, and deflect.

121.    GSP responded to the question by stating that police were not just going to tell Thomas to get his light fixed but were also going to write him a ticket.

122.    GSP then randomly offered that Thomas had a suspended license and also "didn't have a seatbelt on" – facts that only became known after the PIT, and that could not have formed the basis of the stop, pursuit, or the PIT.

123.    Unsolicited, GSP immediately apologized for the callous demeanor and tone and then clarified that they were not at the scene. Cobb County requested assistance from GSP because the pursuit crossed county lines. Therefore, GSP's fatality unit (the SCRT team) was handling the investigation, and he had just been tasked with delivering the terrible news. He visited the scene of the incident, but he never saw Thomas, who had already been taken away from the scene.

## Thomas' Injuries

124.    When Defendant Gehan located Thomas after the PIT maneuver, he was not moving and appeared initially to show no visible signs of life.

125.    Defendant Gehan then "grabs" Thomas by his arm pits and lifts him. He carries Thomas to just parallel of the guardrail and then slides Thomas underneath.

126.    Defendant Gehan and another officer then placed Thomas in "a recovery position," briefly, before moving him two more times.

127.    After moving Thomas' body three times, observing signs of life (breathing), rubbing his chest, Defendant Gehan then moved Thomas a fourth time so the other officers could put handcuffs on him.

128.    Defendant Gehan continued to rub Thomas' chest and aggressively pat him on the back several times.

129.    After the collision and rollover, officers were forcefully slapping Thomas' back despite the fact that his injuries had caused his back to protrude outward in a hunchbacked manner. At one point while they are still hitting Thomas' back, an officer said that Thomas had a "severe back injury."

130.    Thomas was unable to speak, bleeding from his mouth, and repeatedly gasping for air.

COMPLAINT FOR DAMAGES

131.    GSP was dispatched to the scene at approximately 3:54 a.m., arriving at 4:38 a.m.

132.    Thomas was transported to the hospital by EMS, which arrived around 3:40 a.m.

133.    Thomas had a rapid irregular heart rhythm at the scene and briefly on ambulance arrival but went into cardiac arrest and flatlined shortly after.

134.    When Thomas arrived at the emergency room, according to medical notes, he had gone 20 minutes without a pulse, his pupils were fixed and dilated, and he was on an automated chest compression device, known as the Lucas system, but was unresponsive.

135.    While the emergency personnel attempted to resuscitate Thomas, they noticed signs of a fractured femur and severe chest trauma. Thomas also had a 2-inch laceration on his forehead.

136.    Thomas was pronounced dead eight (8) minutes after arriving at the hospital, on May 19, 2024, at 3:48 a.m.

137.    The Fulton County Medical Examiner's Office performed the autopsy on Thomas, because "the collision incident occurred within the geographical boundaries of Fulton County and involved a law enforcement agency."

COMPLAINT FOR DAMAGES

138. According to the Medical Examiner the manner of Thomas' death was homicide.

139. Thomas suffered an assortment of physical injuries. Among the most severe was "complete disarticulation of the 5th and 6th thoracic vertebrae." Complete disarticulation refers to a severe spinal injury where the bones of the spine are completely separated from one another. The thoracic spine is the middle section of the spine, starting at the base of the neck and ending at the bottom of the ribs. Twelve vertebrae make up the thoracic spine. Disarticulation at the 5th and 6th levels of the thoracic spine means that Thomas' spine was severed at his mid-back. A complete disarticulation usually causes a complete neurological defect below the level of the spinal injury.

140. Thomas suffered rib fractures of his 2nd through 6th ribs, bilaterally. This means that Thomas' ribs on both sides, ribs 2-6 inclusive, were fractured. Most people have twelve (12) pairs of ribs. Mr. Thomas' injuries indicate that almost half his ribs were fractured.

141. Thomas also suffered a severe head injury, reflected by a diffuse subscapular hemorrhage, and bruising to the brain.

142. Thomas suffered a fractured femur (thigh bone), which is known to be the longest and strongest bone in the human body.

143. Thomas also suffered a number of acute injuries to his head, neck, torso, extremities, and internal organs.

COMPLAINT FOR DAMAGES

144. Thomas endured the injuries he suffered for some period, perhaps as long as thirty minutes. During that time, he would have been in excruciating pain and would have suffered greatly, as officers manipulated and maneuvered his body several times.

## COUNT I

(All Defendants)

## DETENTION WITHOUT PROBABLE CAUSE – Violation of the Fourth and Fourteenth Amendments under U.S.C. § 1983

145. Defendant Gehan's vehicle pursuit and PIT maneuver were not, at inception, valid seizure(s).

146. When Defendant Gehan made the decision to pursue and then PIT Thomas, he did not have reasonable suspicion or probable cause to believe that Thomas was committing any crime, other than eluding.

147. When Defendant Gehan made the decision to PIT Thomas, he did not have reason to believe that deadly force was warranted.

148. Thomas was seized and detained by Officer Gehan and as a result suffered the loss of liberty, life, and property.

149. In light of the circumstances, Defendant Gehan's conduct can be inferred to be wholly motivated by malice, or reckless or callous indifference to Thomas' constitutional rights.

150. Defendant Cobb County is liable for Defendant Gehan's conduct. If Defendant Gehan is found to have acted outside the scope of his employment, then he is personally liable for his unlawful conduct.

151.    As a result of the detention, Thomas suffered extensive monetary losses, reputational damage, humiliation, and emotional distress.

## COUNT II

(All Defendants)

## MALICIOUS VEHICLE PURSUIT – Violation of Fourteenth Amendment under U.S.C. § 1983

1.

152.    The vehicle pursuit of Thomas was initiated by Defendants was contrary to written Cobb County Police Department Policy via a *Terry* stop Defendant Officer Gehan decided to make, without articulated reasonable suspicion.

153.    Thomas was seized and detained by Officer Gehan and other Cobb County Officers for an ongoing period of time pursuant to that initiation of legal process, suffering the loss of liberty.

154.    Defendant Gehan decided to engage in a vehicle pursuit of Thomas, without reasonable suspicion that Thomas had committed, was attempting to commit, or was committing: murder, voluntary manslaughter, involuntary manslaughter, aggravated assault, aggravated battery, kidnapping, rape, armed robbery, hijacking a motor vehicle, and or any other crime which may include the immediate risk of serious bodily harm to any person (not including the risk posed by the pursuit itself).

155.    The vehicular pursuit of Thomas was unreasonable in length and scope, in light of its permissible purpose of redressing the misdemeanor infraction of eluding and/or establishing reasonable suspicion of one or more of the above

COMPLAINT FOR DAMAGES

listed pursuable offenses or attempting to obtain further information about the suspect/vehicle.

156.    Defendant Gehan detained Thomas beyond the time period reasonably necessary to determine whether Thomas' allegedly "weird" behavior was due to him having committed, attempting to commit, or committing one of the aforementioned offenses, or any other crime, other than alluding, which is not a pursuable offense in and of itself.

157.    Defendant Gehan's extended seizure beyond the time and scope reasonably necessary to redress the alleged conduct he observed, were not justified by probable cause and/or reasonable suspicion of any actual criminal activity, other than the alluding itself.

158.    Defendant Gehan's extension of the detention beyond the time and scope reasonably required by Thomas' alleged conduct was not consensual.

159.    Defendants' efforts to justify the unauthorized and unlawful detention of Thomas, with facts unknown to Defendant Gehan when he made the initial decision to follow and seize Thomas (tampering with the vehicle after Thomas' death, providing post hoc self-serving reports that provide post death observations regarding the reason for the unauthorized pursuit [Thomas had an inoperable headlight, Thomas had a suspended license and was not wearing his seatbelt, Thomas was "rib shacking" Officer Gehan, Thomas was traveling 20 miles over the speed limit while "braking multiple times," Thomas "ran over graves and everything to get away," etc.]), support the inference (under [*Miles v. City of Hazlehurst*, No. 2:22-CV-30, 2024 U.S. Dist. LEXIS 41263, at *19-20 (S.D. Ga. Mar. 8, 2024)]) that Defendant Gehan engaged in the pursuit of Thomas with an intent to physically harm him and or worsen his legal plight, beyond the mere misdemeanor offenses he could have been charged with.

160. Defendant Cobb County is liable for Defendant Gehan's conduct. If Defendant Gehan is found to have acted outside the scope of his employment, then he is personally liable for his unlawful conduct.

161. As a result of the vehicle pursuit, Thomas suffered extensive monetary losses, reputational damage, humiliation, and emotional distress.

162. In addition, for the reasons stated above, these violations were caused, in whole or in part, by the Cobb County Police Department's official and or unofficial policies, customs, or practices of at a minimum allowing officers to initiate vehicle pursuits under circumstances that are wholly contrary to the written departmental policies concerning the same.

## COUNT III

### (All Defendants)

## MALICIOUS USE OF A PRECISION IMMOBILIZATION TECHNIQUE –

### Violation of the Fourteenth Amendment under U.S.C. § 1983

163. The PIT maneuver was used by Defendants contrary to written Cobb County Police Department Policy via a vehicle pursuit Defendant Officer Gehan initiated, without reasonable suspicion that Thomas was committing a pursuable offense.

164. Thomas was seized and detained by Defendant Gehan pursuant to the initiation of that legal process, suffering the loss of liberty, life, and property.

165. The use of a PIT maneuver was unreasonable because Officer Gehan failed to take into consideration the risk that the speed of Thomas' vehicle, the traffic conditions, the type of vehicle Thomas was driving, and or the lack of knowledge regarding whether children were present in Thomas' vehicle, posed against the severity of the alleged failure of "acting weird," or at worst his three misdemeanor offenses.

COMPLAINT FOR DAMAGES

166.    The use of a PIT maneuver was objectively unreasonable given that Officer Gehan was driving a department SUV, a vehicle Cobb County Police Department Policy expressly states should NOT regularly be used for a PIT maneuver.

167.    The use of the PIT maneuver was objectively unreasonable because there was no pre-pursuit risk to life and or need to preserve the public safety, other than the eluding itself.

168.    The use of the PIT maneuver was objectively unreasonable, in light of the fact that Thomas was driving a Lexus model equipped with stabilization software *[a safety feature that prevents the vehicle from skidding or spinning by automatically applying the brakes to help steer the vehicle in the right direction, and that statistically lessons the predictability of a PIT maneuver]*.

169.    Defendant Gehan's decision to use the PIT maneuver despite the above variables was not justified by probable cause and or reasonable suspicion of any actual criminal activity, other than the eluding itself.

170.    Defendant Cobb County is liable for Defendant Gehan's conduct. If Defendant Gehan is found to have acted outside the scope of his employment, then he is personally liable for his unlawful conduct.

171.    As a result of the PIT maneuver, Thomas suffered extensive monetary losses, loss of life, humiliation, and emotional distress.

172.    In addition, for the reasons stated above, these violations were caused, in whole or in part, by the Cobb County Police Department's official and/or unofficial policies, customs, or practices of at a minimum allowing officers to use PIT maneuvers under circumstances that are wholly contrary to the written departmental policies concerning the same.

COMPLAINT FOR DAMAGES

# COUNT IV

## (All Defendants)

## EXCESSIVE FORCE under U.S.C. § 1983

173.    At no time relevant to this action did Thomas pose an objective, immediate threat to the physical safety of Defendants or any other person before Defendant Gehan initiated the vehicle pursuit.

174.    At no time relevant to this claim did Thomas assault or batter any officer of the law.

175.    It was not necessary for Defendant Gehan to use a PIT maneuver and or deadly force in order to securely detain Thomas and or prevent his escape from a misdemeanor offense.

176.    Thomas was seized by Defendant Gehan pursuant to the use of a PIT maneuver, resulting in a brutal assault on Thomas, by Defendants.

177.    Defendant Gehan's decision to use the PIT maneuver was objectively unreasonable given the totality of the above circumstances.

178.    Other Cobb County Officers were present when Defendant Gehan decided to use the PIT maneuver and witnessed Defendant Gehan attempting to PIT Thomas twice. Though they had a reasonable opportunity to intervene in order to prevent or mitigate injury to Thomas, his property, and or others, they chose not to and instead decided to actively engage in the act of providing post hoc reports and statements to justify the decision. The aforementioned supports the inference that any reasonable officer in the position of Defendant Gehan would have known that the use of a PIT maneuver to redress the alleged and or actual actions by Thomas was unreasonable.

179. Any reasonable officer in Defendants' position would have known that they had a duty to prevent deadly harm to Thomas.

180. Defendant Cobb County is liable for Defendant Gehan's and the bystander officers' conduct. If the officers are found to have acted outside the scope of their employment, then they are personally liable for their unlawful conduct.

181. As a direct and proximate result of Defendants' actions Thomas suffered extensive monetary losses, loss of life, humiliation, and emotional distress.

## COUNT V

(Defendant Gehan)

## PUNITIVE DAMAGES

182. Defendant Gehan's conduct as described herein evidences willful misconduct, malice, fraud, wantonness, oppression, and an entire want of care which is sufficient to establish that he acted with conscious indifference to the consequences of his actions.

183. At all material times herein, the Defendants acted with malice and/or reckless indifference to Thomas' federal rights.

184. Plaintiffs are entitled to an award of punitive damages under federal law.

## COUNT VI

(All Defendants)

## ATTORNEYS' FEES AND COSTS

185. Plaintiffs are entitled to an award of attorney's fees under § 1988.

COMPLAINT FOR DAMAGES

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that they have a trial before a jury on all issues and judgment against Defendants as follows:

(a)     That Plaintiffs recover general, compensatory, and punitive damages based on Defendants' violations of federal law;

(b)     That Plaintiffs recover reasonable attorney's fees and expenses of litigation under § 1988;

(c)     That all issues be tried before a jury; and

(d)     For such other and further relief as the Court deems just and proper.


Respectfully submitted this 19th day of May, 2026.


/s/ Harold W. Spence
HAROLD W. SPENCE
Georgia Bar No. 671150
BRITTNEY R. DOBBINS
Georgia Bar No. 218051
MAWULI M. DAVIS
Georgia Bar No. 212029
*Attorneys for Plaintiffs*

**DAVIS BOZEMAN LAW**
4153 - C Flat Shoals Parkway, Suite 332
Decatur, Georgia 30034
(404) 244-2004- Office
(404) 244-2020- Facsimile
HSpence@DavisBozemanLaw.com
BDobbins@DavisBozemanLaw.com
MDavis@DavisBozemanLaw.com

COMPLAINT FOR DAMAGES

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of L.R. 5.1, using font type of Times New Roman and a point size of 14.

This 19th day of May, 2026.

*/s/ Harold W. Spence*
HAROLD W. SPENCE
Georgia Bar No. 671150
BRITTNEY R. DOBBINS
Georgia Bar No. 218051
MAWULI M. DAVIS
Georgia Bar No. 212029
*Attorneys for Plaintiffs*

COMPLAINT FOR DAMAGES

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 19th day of May, 2026, I filed the foregoing with the Clerk of Court through the CM/ECF system which will automatically send electronic mail notification of such filing to the CM/ECF registered participants as identified on the Electronic Mail Notice List.

*/s/ HAROLD W. SPENCE*
HAROLD W. SPENCE
Georgia Bar No. 671150
BRITTNEY R. DOBBINS
Georgia Bar No. 218051
MAWULI M. DAVIS
Georgia Bar No. 212029
*Attorneys for Plaintiffs*

COMPLAINT FOR DAMAGES